UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:22-cr-00001 (JEB) |
| v. | : | |
| | : | |
| DANIEL SHAW, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Daniel Shaw to 30 days' incarceration, 36 months' probation, 60 hours' community service, and $500 in restitution.

**I.     Introduction**

Daniel Shaw, who was 54 years old, on probation, and unemployed, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

On November 17, 2022, Shaw pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] Although the Statement of Offense in this matter, filed on November 17, 2022 (ECF No. 28 at ¶ 11) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a significant sentence of incarceration is appropriate in this case because Shaw: (1) was on probation when he entered the U.S. Capitol, (2) entered the Capitol with his minor son despite observing police detonating flashbang grenades and deploying pepper spray, (3) took photos and/or video on his mobile telephone while he and his minor son were inside of the Capitol, and (4) has expressed no remorse for his criminal conduct on January 6, and gone so far as likening the riot to a religious revival during a post-guilty plea interview.

The Court must also consider that Shaw's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Shaw's crime support a sentence of 30 days incarceration, 36 months' probation, 60 hours' community service, and $500 in restitution in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at 1-7.

*Defendant Shaw's Role in the January 6, 2021 Attack on the Capitol*

In December 2020, Daniel Shaw coordinated his upcoming trip to Washington, D.C. with Kenneth Reda,[2] who he knew through a mutual acquaintance. They discussed their travel plans as well as what they expected to happen on January 6, 2021. On December 28, 2020, Shaw wrote to Reda, "I have no idea what to expect. I have heard that A LOT of special ops guys active and

---

[2] On November 4, 2021, Reda pleaded guilty to violating 40 U.S.C. §5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. D.D.C. 1:21-cr-00452. On March 30, 2022, Judge Hogan sentenced Reda to three years' probation, including 60 days of home detention.

retired are attending looking for any trouble makers lol. Fun is going to be an understatement I think!" Reda then sent a message that he would send Shaw a "link to a pastor that has a large group attending and is meeting at congress at 11am on the 6th[.]" Shaw replied, "Sounds good, strength in numbers, I doubt any soy boys will show up…" Reda then wrote, "You better believe they will be there probably more after dark when the millions leave I want to storm the house during the electoral college vote certification." Shaw responded, "That would be great!" Reda responded, "The [expletive] need to see the PEOPLE[.]" Shaw replied, "I think a few of them need to be made an example of so they UNDERSTAND."

Shaw drove from California to Washington, D.C. with his minor son, who is now 16 years-old son, arriving on January 5, 2021. While in Washington, D.C., Reda joined Shaw and his son, staying at the same hotel in Washington, D.C. On January 5, 2021, Shaw and his son went to the U.S. Capitol grounds, where others had congregated, and told a reporter that he drove all the way from California for "this." He also asked, "where is our America?"[3]

On January 6, 2021, as Shaw, his son, and Reda approached the Capitol building, Shaw observed a mob of people forming on the Capitol grounds. Shaw, his son, and Reda continued around the Capitol towards the East side. As Shaw approached the plaza on the East side of the Capitol, he stepped over a police barricade fashioned from bicycle racks that rioters had knocked to the ground. As he moved forwarded towards the building, he would have seen officers attempting to direct rioters from proceeding forward.[4] Shaw then stood on the plaza at the bottom of the stairs leading up towards the Rotunda Doors, where officers in riot gear were situated at the

---

[3] This interview is available at https://www.youtube.com/watch?v=sS6bTHPPcwM&t=1746s at timestamp 29:10.
[4] This video available at https://www.youtube.com/watch?v=WmV_7W4em5A&t=56s at timestamp 00:55.

top of the stairs.  At that moment, the area in front of the Rotunda Doors was still free from rioters and had not been breached yet.



(Image 1, recovered from Shaw's cellular telephone)

With the assistance of rioters who had breached the Capitol from the West front and were already inside of the building, rioters initially breached the Rotunda Doors at approximately 2:25 p.m. Police Officers were able to secure the doors at approximately 2:28 p.m.  But rioters were able to breach the door a second time at approximately 2:38 p.m., again with the assistance of the rioters already inside of the building.

While outside of the Capitol, Shaw would have been able to hear police officers detonating flashbang grenades and seen the officers deploying tear gas.  Shaw, his son, and Reda ascended the stairs towards the Rotunda doors, where they remained, according to Shaw, for approximately an hour before entering the Capitol.  While on the steps, Shaw remained with his fellow rioters as

multiple officers, some with riot shields, guarded the Rotunda Doors. The window embedded in the Rotunda Doors was conspicuously shattered.

 

(Image 2 showing shattered glass, circled in blue)   (Image 3, with Shaw, circled in red)[5]

At approximately 3:02 p.m., Shaw, his son, and Reda breached the U.S. Capitol via the Rotunda Doors, passing shattered glass while the alarms were blaring.[6] Shaw took videos and photographs while inside of the Capitol.



---

[5] Both images are still images from a video available at https://web.archive.org/web/20210111072402/https://video.parler.com/ai/8A/ai8AzhEoyrGX.mp4.
[6] Video available at https://www.youtube.com/watch?v=jBRJmnvFfo8&t=831s at timestamps 13:05 – 14:03.

(Image 4, Shaw, circled in red, entering the U.S. Capitol)



(Image 5, Shaw with his son inside of the Rotunda)

At approximately 3:05 p.m., officers began filling the Rotunda in order to force the rioters out of the Rotunda. Shaw was inside of the Rotunda when officers began this push and even walked closer to the side of the room where the officers were entering the Rotunda. Shaw, his son, and Reda eventually left the Capitol at approximately 3:16 p.m. via the Rotunda Doors.



(Image 6, Shaw, circled in red, in the Rotunda at approximately 3:06 p.m.)

*Social Media Posts*

Case 1:22-cr-00001-JEB   Document 37   Filed 03/10/23   Page 7 of 20

Shaw maintains a Twitter page with a byline identifying himself as having been arrested in connection to the January 6, 2021 riot at the Capitol.[7]



(Image 7, Shaw's Twitter page)

Shaw has posted numerous posts containing false claims on his Twitter page about the January 6, 2021 siege of the Capitol, including several posts after his plea hearing before this Court. The following are some examples of those posts:



(Image 8, March 3, 2023 post)

---

[7]     Shaw's Twitter page is available at https://twitter.com/DanielWadeShaw3.

7



(Image 9, Shaw's March 9, 2023 post)

*Shaw's Post-Plea Interview by FBI Agents*

On February 21, 2023, Shaw, with his counsel present, gave a voluntary post-plea interview with the FBI. During this interview, Shaw stated that he thought January 6, 2021 was going to be a big celebration and a beautiful thing. He stated that he was apparently wrong, and the election was not certified as it should have been. Shaw drove cross country with his son, who was having a difficult time without sports during the COVID pandemic, because Shaw thought it would be good for his son to get out, see the countryside, and have a good time.

When asked about his thoughts while marching towards the Capitol on January 6, Shaw stated that everyone was so nice and noted there were so many Christian groups present that day. He added that people were praying and there was a "bunch of really nice humans." Shaw stated

8

things got weird because it was like everything was "unleashed" on everyone. He later stated that he was referring to the flashbang grenades. He said, however, that things "settled down," and got quiet. He said an unidentified person who Shaw believed was a police officer said "they" would let people out of the Capitol building and then others could enter. Shaw said the police officers were really nice and he did not think it was going to be a problem at all. He claimed that, in hindsight, he now understands the riot was a problem.

Shaw claimed to not having seen any violence involving police officers. While on the steps of the Capitol for approximately an hour prior to his entrance, he heard flashbang grenades explode and saw police dispersing pepper spray. He did not remember any broken glass. He vaguely recalled an alarm," some sort of "high-pitched noise." While outside, he said people were praying and chanting "U.S.A." He was not concerned for his safety because everyone he talked to was really nice. He did not feel like anyone was going to hurt them.

When asked about his thoughts regarding January 6, 2021, he said he did not really pay attention to the news and has unregistered to vote, claiming it is not worth it. He said it was not worth getting arrested and grateful about how the FBI executed their warrants for his arrest at his Probation office rather than early in the morning at his home. Shaw also stated he was still active on social media and expressed appreciation for the First Amendment. Shaw then said that he has never been to a revival before, but January 6, 2021 felt like how he imagined a religious revival would feel like. He said people were praying for the election and praying for Donald Trump. He added that the divide in the country is horrible.

*The Charges and Plea Agreement*

On November 29, 2021, the United States charged Shaw by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December

3, 2021, law enforcement officers arrested him at his probation officer's office in California. On January 4, 2022, the United States charged Shaw by a four-count indictment with the same four offenses. On November 17, 2022, pursuant to a plea agreement, Shaw pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. §5104(e)(2)(G). By plea agreement, Shaw agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Shaw now faces a sentencing on a single count of violating 40 U.S.C. §5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Shaw faces up to six months of imprisonment and a fine of up to $5,000. Shaw must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days incarceration, 36 months' probation, 60 hours' community service, and $500 in restitution.

#### A.     The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Shaw's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Shaw, the absence of violent or destructive acts is not a mitigating factor. Had Shaw engaged in such conduct, he or she would have faced additional criminal charges.

Shaw, who was on California state probation at the time, traveled to Washington, D.C. to protest the 2020 Election. He took his minor son with him as he approached the Capitol, where flashbangs and pepper spray were being deployed. Shaw claims to not having witnessed any violence towards officers. However, this statement is dubious given he had to pass the chaos unfolding on the West Lawn in order to approach the East side of the Capitol, where he ultimately entered. Despite the flashbangs, tear gas, shattered glass, and alarms blaring, Shaw claimed that at the time he did not realize he was not allowed to enter the Capitol. Again, this statement flies in the face of the evidence and common sense. Notably, he remained on the steps of the Capitol for approximately an hour, according to his own estimation, which would have included the time in which the Rotunda Doors were breached by rioters, not once but twice. After gaining entry, he proceeded to video and photograph his time in the Capitol, including his entrance and the Rotunda.

Shas has continued to post to his social media account spreading false claims about the events that occurred at the U.S. Capitol on January 6, 2021 by claiming it was entrapment. During his post-plea interview, he even likened the experience as something similar to what he imagines would be a religious revival. Shaw has failed to demonstrate sincere remorse for what transpired on January 6, 2021 and more importantly, how his actions contributed to one of the darkest stains on our country's history.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Shaw

In March 2017, Shaw was driving while under the influence of alcohol with a minor in his vehicle. He crashed his vehicle. The PSR contains no information about the injuries suffered by Shaw's passenger, if any. Shaw was hospitalized because of his serious injuries. PSR ¶¶ 26, 40.

Shaw was convicted in Sonoma County Superior Court, California, of Child Cruelty, Possible Injury or Death and Driving While Under the Influence and was sentenced on December 19, 2017, to 90 days' incarceration and 48 months of probation. He was still serving that probationary sentence on January 6, 2021. PSR ¶ 26.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, Shaw committed criminal acts at the U.S. Capitol while on probation, which prohibited him from committing other crimes. Yet, that was insufficient deterrence to travel to Washington, D.C. and participate in the January 6 riot. He stood on the steps near the Rotunda Doors for approximately an hour while those doors were breached twice by his fellow rioters. Despite hearing flashbang grenades explode, seeing pepper spray deployed, and hearing the alarms blaring, Shaw walked into the U.S. Capitol passing shattered glass and officers who were severely outnumbered by Shaw and his fellow rioters. Shaw's brazen violation of the law on January 6 while serving a sentence of probation demonstrates the need for a sentence of incarceration to serve the need for specific deterrence.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Shaw based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: Shaw participation in the January 6 riot.

Shaw has pleaded guilty to Count Four of the Information, charging him with 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G.

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

15

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

17

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Bryan Betancur* (21-cr-51(TJK)), the defendant was on probation when he went to the Capitol on January 6, 2021.  Betancur spent several hours on Capitol grounds and made multiple posts on social media.  While standing outside of the Capitol, he assisted other rioters who were removing furniture from the Capitol and then entered the Capitol briefly.  The defendant plead guilty to violating 18 U.S.C. §1752(a)(1), a more serious offense than the crime to which Shaw pleaded guilty.  Judge Kelly sentenced Betancur to four months' incarceration.

In *United States v. James Bonet* (21-cr-121(EGS)), the defendant filmed his approach to the Capitol.  Bonet entered Senator Merkley's office for approximately four minutes and smoked marijuana.  A few weeks prior to his sentencing, Bonet gave a news interview where he described January 6, 2021 as "peaceful" and that the cops let him in.  The defendant plead guilty to 18 U.S.C. §1752(a)(1) and was sentenced to 90 days' incarceration and one year' probation.

In *United States v. Kenneth Reda* (21-cr-452(TFH)), the defendant entered and later left the Capitol with Shaw and Shaw's minor son.  While inside, he filmed and photographed what was transpiring around him.  He then posted online statements minimizing what transpired at the Capitol earlier that day.  Reda plead guilty to violating 40 U.S.C. 5104(e)(2)(G) and was sentenced to two months' home detention and 36 months' probation. Shaw deserves a substantially higher sentence than Reda because Reda did not bring a minor for whom he was responsible to a riot and was not on probation when he violated the law on January 6, 2021. When he was debriefed by the FBI, Reda claimed that, while in and around the Capitol, he intervened at least twice to help police officers who needed assistance.  The government was unable to either corroborate or contradict that claim. Docket No. 21-cr-452, ECF 35 (government's sentencing memo).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[9]

---

[9] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

19

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Shaw to 30 days' incarceration, 36 months' probation, 60 hours' community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     /s/ *Maria Y. Fedor*
MARIA Y. FEDOR
Attorney, detailed to the
United States Attorney's Office for the
District of Columbia
D.C. Bar No. 985823
601 D Street, N.W.
Washington, DC 20530
Maria.Fedor@usdoj.gov

---

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.